Edward F. Finney v. Commissioner. Betty Finney v. Commissioner.
Finney v. Commissioner
Docket Nos. 51010, 51011.
United States Tax Court
T.C. Memo 1956-247; 1956 Tax Ct. Memo LEXIS 46; 15 T.C.M. (CCH) 1263; T.C.M. (RIA) 56247; November 9, 1956
*46 1. Petitioner purchased a motion picture film in 1943 and continued to spend sums to adapt it for commercial exhibition until approximately August of 1945. Thereafter, he made continuous efforts to sell or distribute the film, culminating in a sale in 1951. Held, despite the fact that the picture dealt with an imaginary Nazi occupation of the United States, and the fact that Nazi Germany was defeated in 1945, the evidence does not establish the film to have become worthless in 1945. 2. In 1943 petitioner purchased a film from one representing himself as having authority to execute the sale. In late 1945 petitioner was informed of claims adverse to his purported interest. He did not concede the correctness of such claims and in fact sent the film to his English agent for marketing. In 1946 the film was seized pursuant to legal proceedings commenced by the adverse claimants. Thereafter, petitioner made no more than a casual inquiry with respect to the potential liability and financial standing of the person from whom he had purchased the film. The evidence does not establish such person to have ever been insolvent. Held, petitioner has failed to prove that his claimed interest in *47 the film became worthless in 1945; furthermore, he has not established the absence of a valuable claim against his seller. 3. In 1942 petitioner and two others formed a corporation for the purpose of producing motion pictures. Petitioner became a 20 per cent stockholder and also a creditor of the corporation in the amount of $20,000. Various contracts between the stockholders and the corporation provided petitioner with valuable rights not normally held merely on the basis of stock ownership or a debtor-creditor relationship. Disagreements arose between petitioner and the majority stockholder, which were finally resolved in an agreement whereby petitioner sold his stock to the corporation and also executed a general release and permitted the pledge of his share of profits from a picture already produced to help finance a subsequent production. In return he was to receive, inter alia, a share of the profits from the next three pictures to be produced. Held, petitioner did not merely sell shares of stock; he surrendered various other rights and gave valuable rights to the corporation which it would not otherwise have been able to exercise. Amounts received from a film subsequently *48 produced were not amounts received as part of the purchase price of petitioner's stock; they are taxable as ordinary income. Edward F. Finney, 6525 Sunset Boulevard, Los Angeles, Calif., pro se. Joseph G. White, Jr., Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in the income tax of petitioners as follows: Edward F.
Year
Finney
Betty Finney
1944
$ 1,091.02
$ 1,112.44
1945
10,160.59
10,280.59 The issues to be decided are as follows: 1. Did the motion picture "Strange Holiday" become worthless in 1945? 2. Did petitioners' investment in the motion picture "White Fury" become worthless in 1945? 3. Did amounts received by petitioners in 1945 as a result of the motion picture "Sensations of 1945" constitute ordinary income, as determined by respondent, or long-term capital gain, as contended by petitioners? Respondent now concedes certain other matters, and these concessions will be reflected in the computations to be made pursuant to Rule 50. Findings of Fact Petitioners are husband and wife residing at 6525 Sunset Boulevard, Los Angeles, California. Their *49 individual income tax returns for the calendar years 1944 and 1945 were filed on the cash basis with the then collector of internal revenue for the sixth district of California, at Los Angeles. Edward F. Finney will hereinafter be referred to as the petitioner. Betty Finney is a petitioner herein solely because of the fact that the returns for the years in question were filed on the community property basis. Petitioner has been engaged in various phases of the motion picture industry, including the production, direction, purchases and sales of motion pictures. 1. In 1943 petitioner purchased a motion picture entitled "Strange Holiday" from a major studio. This picture starred Claude Rains, and dealt with an imaginary invasion and occupation of the United States by the forces of Nazi Germany. It had originally been produced by an industrial corporation at a cost of approximately $200,000, for exhibition to employees. It was then sold to the studio for approximately $50,000. The purchase price paid by petitioner was $4,000. In addition, changes were made to adapt the picture for commercial exhibition, at a cost of $6,300, making a total outlay in the amount of $10,600. Expenditures *50 continued until at least some time in August of 1945. In 1945 petitioner was unsuccessful in attempts to distribute "Strange Holiday" for exhibition. Thereafter, he kept the picture in storage but without payment of storage fees, and made constant but non-intensive efforts to sell or distribute it. In 1951 it was sold for approximately $2,100. The purchaser thereafter expended approximately $20,000 in activities preliminary to exhibition, and did in fact exhibit "Strange Holiday". In their 1945 returns, petitioner and his wife each deducted one-half of the total amount representing costs and expenditures incurred by petitioner in respect of "Strange Holiday", on the theory that it had become worthless in 1945. Respondent has disallowed such deductions, on the theory that such worthlessness in that year has not been established. 2. In 1943 petitioner and A. W. Hackel purchased for $3,000 distribution rights, copyrights and various other rights to a motion picture produced in Sweden, purportedly owned by a Swedish corporation know as Irefilm, and entitled "White Fury". $500 was paid in 1943 and the balance of $2,500 on September 21, 1945. These payments were made to an individual *51 who had produced and directed that film, and who represented himself as fully authorized to sell it. Petitioner paid the $3,000 required by the terms of the sale and also incurred expenses in the amount of $7,000 in readapting "White Fury", or a total outlay in the amount of $10,000. Changes and readaptation began in 1943 and ended in the summer of 1945. A first screening took place in September or October of 1945. After the screening a representative of a Swedish business organization denominated A. B. Sandrew-Ateljeerna contacted petitioner. He alleged that Irefilm had become a bankrupt in 1939, that his principal owned all rights to "White Fury", and that the person who had purported to sell the film had no authority to do so. A series of correspondence and telephone conversations then commenced. An offer by the Swedish firm to permit petitioner for $10,000 to hold and exercise the rights purportedly transferred to him was rejected. While these communications were taking place petitioner sent the negative of "White Fury" to his agent in England to attempt to sell English rights in it. On December 3, 1945, an attorney representing the Swedish firm wrote to that agent, informing *52 him of the existing situation, and alleging that petitioner had no rights in the film. A series of correspondence then commenced between the agent and the representatives of the Swedish firm. At no time during 1945 did petitioner admit by word or deed the correctness of any claims adverse to his purported interest in "White Fury". When a seizure of the negative in the agent's possession was threeatened, petitioner instructed his agent to resist such action. However, sometime in 1946 an injunction was secured and the negative seized. Thereafter, petitioner made only minor efforts to determine the liability of the person to whom the $3,000 had been paid. No effort was made to collect any part of that amount. His investigation went no further than a general observation of the dwelling and automobile of that person, an inquiry of a mutual friend, which disclosed that the individual involved was a veteran of World War II and had recently married, and an oral statement by the seller that he didn't have any money. On their 1945 returns petitioner and his wife each deducted one-half of the total amount representing costs and expenditures by petitioner in respect of "White Fury", on the *53 theory that petitioner's interest therein had become worthless in 1945. Respondent has disallowed that deduction, on the theory that such worthlessness in that year has not been established. 3. In 1942 petitioner learned that Andrew Stone planned to produce a series of motion pictures through a corporation to be organized. He joined in this enterprise, and Andrew Stone Productions, Inc. (hereinafter called "Productions") was formed on September 16, 1942. Petitioner lent Productions $20,000, payable out of profits only, with interest at six per cent per annum. No note or other evidence of indebtedness was issued. However, because of the loan, petitioner was permitted to purchase for $20 twenty shares of common stock. As of January 8, 1943, total capital stock outstanding consisted of 100 shares held as follows: Shareholder
No. of Shares
Andrew Stone
60
Frederick Jackson
20
Edward Finney
20
Productions was financed by loans from banks and others. At the time of its formation it and the three stockholders entered into agreements respecting various matters, including services to be rendered by and salaries to be paid to each. The agreements respecting services *54 and salaries were particularly pertinent to a motion picture entitled "Hi Diddle Diddle", subsequently produced by Productions. At least three such written agreements were executed on, respectively, December 31, 1942, March 10, 1943, and August 6, 1943. The three stockholders became officers, directors and employees. Petitioner was employed as associate producer for "Hi Diddle Diddle". He assisted in obtaining financing, organized the production staff, helped cast part of the picture, engaged the office staff, and handled diverse other business matters. Jackson wrote the screen play, and Stone was employed as producerdirector. The salary payable to petitioner for his services in the production of "Hi Diddle Diddle" was $12,000. That of Jackson and Stone was, respectively, $20,000 and $60,000. A substantial part of each of the foregoing salaries was deferred pursuant to written agreement. Production of "Hi Diddle Diddle" commenced in March of 1943, and the film was released in August of the same year. Shortly after Productions commenced activity persistent disagreements arose between petitioner and Stone. Attempts at reconciliation failed, until a written agreement was entered into *55 dated September 23, 1943. Both parties were represented by counsel, and dealt at arm's length. At the time of the foregoing agreement petitioner had received neither interest nor principal on his loan, and $9,000 remained unpaid of his salary for "Hi Diddle Diddle". The only asset then owned by Productions, aside from an insubstantial amount of cash, was that film. It was subject to substantial liabilities, but an agreement with United Artists provided for its distribution and exhibition. The settlement of September 23 was in the form of a letter addressed to Productions and signed by petitioner and Stone, and, in turn, approved on behalf of Productions by its president and secretary. It read in part as follows: "This will confirm our understanding that all previous agreements heretofore entered into between us including but not limited to those agreements dated as of December 31, 1942, March 10, 1943, and August 6, 1943, are rescinded and cancelled and in addition to the salary of $12,000 for my services rendered in connection with the production of the motion picture photoplay Hi-Diddle-Diddle of which sum I have heretofore received $3,000 and the remainder of $9,000 is to *56 be paid to me concurrently with salary payments yet to be made to Andrew L. Stone and Frederick Jackson as negative costs of Hi-Diddle-Diddle, are recouped, I hereby agree to sell to you or your nominees all capital stock now held by me in Andrew Stone Productions, Inc., for the following consideration, to-wit: "(a) In addition to the sum of $9,000 cash to be paid me from recoupment of the negative costs of Hi-Diddle-Diddle (constituting deferred salary and hereinabove referred to) I am to receive $5,000 in cash within three weeks of the commencement of the principal photography upon the next picture to be produced by Andrew Stone together with the deferred payment of $2,500.00 payable within two years from the release date of said picture and in addition thereto I am to receive a cash payment of $5,000 within three weeks from the commencement of principal photography upon the second motion picture yet to be produced by Andrew Stone, and an additional cash payment of $6,000 within three weeks from the commencement of principal photography upon the third picture yet to be produced by Andrew Stone for release by United Artists under the existing distribution agreement or any extension, *57 renewal, replacement or substitution thereof. "(b) In addition to the cash payments hereinabove specified I am to receive directly from United Artists as distributor of Hi-Diddle-Diddle, 20% of the producer's net profits receivable by producer from the production and/or distribution of Hi-Diddle-Diddle and 12% of the producer's net profits receivable by producer from the production and/or distribution of each of the next three motion pictures produced by Andrew Stone for release by United Artists under the existing distribution agreement or any extension, renewal, replacement or substitution thereof. * * *" "Producer's net profits" are defined in the agreement as receipts less certain specified costs and expenses and all taxes. However, deductions for salaries to Jackson and Stone were limited for the purpose of computing "producer's net profits". The agreement further provided in part as follows: * * *
"2. I consent to the pledge of my share of the residual values in Hi-Diddle-Diddle upon the same basis only as the pledge of all other residual shares as security for financing necessary to production of the second picture to be produced by Andrew Stone and I furthermore *58 consent to the pledge of my share of the residual values upon the second picture yet to be produced by Andrew Stone for financing necessary to production of the third picture to be produced by Andrew Stone, upon the same basis as the pledge of all other residual shares, and I furthermore consent to the pledge of my share of the residual values in the third picture to be produced by Andrew Stone upon the same basis as all other residual shares, if it is necessary to pledge the same to secure financing to produce the fourth picture to be produced by Andrew Stone; * * *
"4. It is expressly understood that I shall not be obligated to render services of any nature whatsoever in the future and shall not be deemed to be an agent, partner, representative, associate or affiliate of yourself or any of the producing companies hereafter concerned with the production of said three motion pictures yet to be delivered to United Artists, and I shall be held free and harmless of and from all personal liability whatsoever in connection with the production and/or distribution of each of said pictures. "5. The aggregate sum of $20,000 invested by me in Hi-Diddle-Diddle shall be repaid from the *59 recoupment of negative costs upon said motion picture together with interest at 6% from the dates of each advance made by me as soon as the prior liens of the banks, Standard Capital, DeLuxe Laboratories, and General Service Studios upon said motion pictures have been discharged, which sum of $20,000 may be paid directly for my benefit and on my account to the Bank of America National Trust & Savings Association as provided in that certain agreement executed with Standard Capital Co. dated March 18, 1943." The agreement also provided that petitioner would be credited as "associate producer", contained a general release by petitioner, and specified that it constituted the compromise of a controversy. It specifically limited petitioner's rights to the next three pictures to be produced after "Hi Diddle Diddle" for distribution through United Artists. The foregoing payments were due only if such pictures should be produced. Petitioner could not affirmatively require the production of any pictures. Sometime in 1943, after the foregoing agreement of September 23, Productions was liquidated and dissolved. Thereafter, Stone and Jackson produced a motion picture entitled "Sensations of *60 1945" through a corporation in which petitioner had no interest but which apparently inherited Productions' liabilities under the agreement of September 23. Petitioner was entitled, inter alia, to 12 per cent of the "producer's net profits" on "Sensations of 1945". For reasons which represented arm's length considerations, he consented to the reduction of the share to 10.8 per cent. In 1944 petitioner received $12,500 as a result of the film "Hi Diddle Diddle". In 1945 he received $39,862.46 as a result of "Hi Diddle Diddle" and $10,824 as a result of "Sensations of 1945". "Strange Holiday" did not become worthless in 1945. Petitioner did not in 1945 abandon his claim with respect to "White Fury". This claim did not become worthless in 1945 and petitioner may not deduct as a loss in that year the amount of his investment therein. The amounts received by petitioner on account of "Sensations of 1945" represent amounts received as consideration for the sale or transfer of his shares of stock in Productions. They are not proceeds from the sale or exchange of capital assets, and are taxable as ordinary income. Opinion RAUM, Judge: 1. Petitioner purchased "Strange Holiday" in *61 1943. Adaptation thereof continued until August of 1945, several months after the surrender of Nazi Germany. Petitioner thereafter persisted in attempts to market the film and finally sold it in 1951. The question of worthlessness is peculiarly one of fact. Cf. ; (C.A. 4). Petitioner bears the burden of proving respondent to be in error with respect to this issue, and having reviewed the entire record, we cannot find that he has successfully met this burden. The cessation of armed resistance on the part of Nazi Germany may have made "Strange Holiday" less valuable than at any time prior thereto, but that fact alone does not establish it to have become completely worthless. In fact, work continued and sums were expended on that picture until about August of 1945. This fact seems inconsistent with petitioner's contention that the surrender of Germany was an event making the film worthless. No explanation has been offered for this, and we can only conclude that petitioner did not himself consider the picture worthless upon the fall of Nazi Germany. And he has not established *62 that it became worthless at any other time during the taxable year 1945. Furthermore, petitioner continuously made efforts after 1945 to sell or distribute "Strange Holiday". These efforts were rewarded in 1951 when it was sold for $2,100. Taken as a whole, the evidence does not prove that "Strange Holiday" became worthless in 1945. Respondent did not err in disallowing the deduction claimed. 2. In 1943 petitioner and another entered into a transaction whereby they purported to purchase various rights in and to a motion picture entitled "White Fury". In 1945, after certain work had been accomplished and a preview showing had taken place, it became apparent that there was a cloud on petitioners' purported interest. The gravamen of the claims against petitioner was to the effect that the person who had sold him this interest had acted without authority. Negotiations and other activities in respect of "White Fury" continued until 1946, at which time the film, which was then in the hands of petitioners' agent in England, was seized pursuant to injunction. Petitioner did not at any time in 1945 concede the truth of the allegations adverse to his interest. He resisted the efforts at *63 seizure, and we cannot find from the record that such resistance ended in 1945. Furthermore, he made no effort to recover from the person who had purported to sell him "White Fury". No demand for redress was ever made, and petitioner made no attempt to obtain recoupment of any part of the purchase price or expenditures incurred. We cannot find from the record as it exists that petitioner's investment in "White Fury" in fact became worthless in 1945. Petitioner had not yielded to adverse claims in that year. In fact, the film was in the possession of his agent until sometime in 1946, and it is apparent that petitioner's intention was to resist claims by the Swedish firm, at least until the injunction was secured. Actual seizure occurred in 1946, and we cannot speculate on the date of the injunction. The only evidence thereon was a statement by petitioner that "the closing down on it, I believe, was in '45." But even if we assume the correctness of the position taken by the Swedish firm, and if we further assume an abandonment of the issue by petitioner in 1945, petitioner has still failed to establish his right to the deduction claimed. He may well have had a valuable claim against *64 the person who sold him the picture. If such claim existed against a solvent debtor, then clearly petitioner's investment had not become worthless. And a failure on his part to press this claim would not entitle him to a deduction. Cf. (C.A. 10). The burden of proof rests with petitioner. He has not demonstrated the absence of any right to proceed against the unauthorized seller. And the evidence falls far short of proving that such party was in fact financially unable to respond. For the foregoing reasons, we conclude that respondent did not err in disallowing the deduction here in issue. 3. In 1942 petitioner and others formed Productions for the purpose of producing motion pictures, to be distributed by United Artists. As part of the plan of organization petitioner purchased 20 shares of stock for $20, and "lent" Productions $20,000. The "loan" was payable out of profits only, and was not evidenced by a note. Differences arose between petitioner and the majority shareholder. One picture was produced, after which the foregoing differences being irreconcilable, petitioner, the majority stockholder, and Productions *65 executed an agreement providing for the withdrawal of petitioner. Petitioner was to receive certain amounts already earned, and also fixed amounts plus a percentage of profits upon the next three films to be produced pursuant to the contract with United Artists. Thereafter Productions was dissolved, and a new corporation was formed, which succeeded to its liabilities with respect to petitioner. A second film was produced and petitioner received certain amounts in respect thereof during the taxable year 1945. Respondent has determined that such amounts are taxable as ordinary income. Petitioner, on the other hand, claims that they represent a part of the sale price of his stock in Productions, and qualify for treatment as long-term capital gain. The agreement of September 23, 1943, dealt with far more than the mere transfer of title to petitioner's shares of stock in Productions. Petitioner executed a general release, thereby releasing the other parties to that agreement from prior agreements between them, of which there were at least three. Furthermore, petitioner permitted the pledge, where necessary, of, inter alia, amounts due him in respect of "Hi Diddle Diddle", for the financing *66 of the next motion picture to be produced. Petitioner was not merely a stockholder, but held as well the right to participate in profits from future pictures to be produced, and to be employed in such production. In fact, he admits on brief that factors causing Stone to agree to provisions giving him a share in pictures subsequently to be made included a general release and the right to pledge petitioner's residual value in "Hi Diddle Diddle". We are amply satisfied that petitioner did more by virtue of the agreement of September 23 than merely sell shares of stock. He has not shown respondent to be in error with respect to this issue. Petitioner appeared without the aid of counsel, and was undoubtedly hampered by that circumstance in the presentation of his case. Nonetheless, we are bound by the record as made. On the basis of that record, we cannot hold that respondent erred in treating as ordinary income the amount received in 1945 in respect of "Sensations of 1945". Decisions will be entered under Rule 50.